# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs January 24, 2012

## BRIAN DEWAYNE BREWINGTON v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court of Sumner County**
**No. 1115-2009    Dee David Gay, Judge**

---

### No. M2011-00752-CCA-R3-PC - Filed April 5, 2012

---

Brian Dewayne Brewington ("the Petitioner") filed for post-conviction relief from his convictions of two counts of aggravated child neglect, two counts of child neglect, and the resulting sentence of twenty-five years. He alleges that he received ineffective assistance of counsel at trial and at sentencing. After an evidentiary hearing, the post-conviction court denied relief, and this appeal followed. Upon our careful review of the record, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment
of the Criminal Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Lawren B. Lassiter, Gallatin, Tennessee, for the appellant, Brian Dewayne Brewington.

Robert E. Cooper, Jr., Attorney General & Reporter; Benjamin A. Ball, Assistant Attorney General; L. Ray Whitley, District Attorney General; Sallie Wade Brown, Assistant District Attorney General; for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

The Petitioner and his wife, Brenda Faye Brewington, were jointly indicted and tried before a jury on two counts of aggravated child neglect and two counts of child neglect stemming from their treatment of their four children, all of whom were five years old or younger at the time. The jury convicted the Petitioner as charged and the trial court sentenced him to serve twenty-five years at one hundred percent. This Court affirmed the

Petitioner's convictions and sentence on direct appeal. State v. Brenda Faye Brewington, No. M2007-01725-CCA-R3-CD, 2009 WL 142321, at * 12 (Tenn. Crim. App. Jan. 21, 2009). The Petitioner subsequently filed a petition for post-conviction relief on the grounds that he received ineffective assistance of counsel at trial and at sentencing.

In order to place the Petitioner's claim into context, we repeat here the summary of the proof adduced at trial as set forth in the decision rendered on the Petitioner's direct appeal.

Jill Ashworth testified that she was supervisor with Child Protective Services. On December 29, 2005, she received a referral regarding the defendants, which alleged that the defendants were engaged in environmental and nutritional neglect of their children. On January 4, 2006, Mrs. Ashworth and another case worker, Amber Spann, went to the defendants' home. Mrs. Brewington answered the door. After Mrs. Ashworth explained the purpose of the visit, Mrs. Brewington became visibly angry and "yelled for Mr. Brewington." Mr. Brewington came to the door. Mr. Brewington told Mrs. Ashworth that he was employed with the Sheriff's Department and allowed the caseworkers inside the home.

Mrs. Ashworth testified that once she entered the living room of the defendants' home, she observed "massive amounts of trash" piled up, including toys, clothes, old food, and a pizza box containing insect casings. She also saw that the defendants' three-year-old son, Bryson, was not clothed and [was] "running through the rooms." After Mrs. Ashworth inquired into the whereabouts of the defendants' other children, she was told that their five-year-old daughter, Katarina, was at school, and Ashley and Madison, the defendants' youngest children, were in their room. Mrs. Ashworth recounted that she had to climb over piles of toys, clothes, and stuff in the hallway in order to reach Ashley and Madison's room. When she saw Ashley and Madison, she observed that they were both lying in separate cribs without sheets, and they were not moving. Mrs. Ashworth observed more stuff piled in their cribs with them. When she approached both children, she could see that their eyes moved back and forth but otherwise they did not move. According to Mrs. Ashworth, Madison, who was eleven months old at the time, looked like a skeleton. Mrs. Ashworth recalled that she asked Mrs. Brewington if Madison had been to a doctor. Although Mrs. Brewington told Mrs. Ashworth that Madison had been to a doctor when she was six months old, Mrs. Ashworth later discovered that Madison had not seen a doctor since birth.

Mrs. Ashworth testified that after she saw the condition of the children and the home, she explained to the defendants the next steps the Department of Children's Services (DCS) would take. At this time, Mr. Brewington became concerned that he would lose his job with the Sheriff's Department. Mrs. Ashworth testified that she made the decision to have Ashley and Madison transported immediately to the emergency room of the hospital. Mrs. Ashworth stated that once they arrived in the emergency room waiting area, Mrs. Brewington put down Madison's car seat and "roaches just came out everywhere." Mrs. Ashworth also noted that roaches crawled out of Ashley's clothes while she was being held. According to Mrs. Ashworth, Madison did not make a sound while being examined. Madison, who was eleven months old at the time of the examination, weighed ten pounds six ounces. Mrs. Ashworth recalled that Madison's birth weight was a little over eight pounds. Mrs. Ashworth stated that Ashley, who was two years old at the time, was also examined. Ashley could not get out of a sitting position when a doctor tried to get her to walk.

Mrs. Ashworth testified that while at the hospital a safety plan was formulated which allowed for reunification of the children with the defendants. However, the safety plan was changed later because of the circumstances of the case. Mrs. Ashworth recalled that the day after the children were removed, she went to the defendants' house to take pictures. Mrs. Ashworth noted that the condition inside the house had not changed. Mrs. Ashworth said that she observed a "lot of mice activity," and heard rustling noises coming from the piles of trash in the kitchen. After taking a number of pictures, Mrs. Ashworth left the house and called law enforcement authorities because the conditions in the home were so bad. Mrs. Ashworth testified that she had a meeting with the defendants. At this time, Mrs. Brewington informed DCS that she did not think her children needed medical attention. Mr. Brewington continued to voice his concerns about losing his job, filing for bankruptcy, and medical care being too expensive even though he carried insurance for the family. Mrs. Ashworth said she took pictures of Madison. She recounted that Madison had very little hair and what hair she had was dry and brittle. Madison's rib cage was visible and she had very little muscle tone in her back or legs. Madison had difficulty holding her head up.

On cross-examination, Mrs. Ashworth acknowledged that the medical examination for Ashley and Madison took approximately fifteen minutes and the doctor did not prescribe any medication but said they needed food. Mrs. Ashworth also acknowledged that she did not notice any bug bites on the children at the time of the examination.

Sergeant Rickey Troup of the Gallatin Police Department testified that he went out to investigate the defendants' residence after receiving a call from DCS. Sergeant Troup recalled that he talked with the defendants and they did not appear concerned about the well-being of their children. According to Sergeant Troup, the defendants gave him written consent to enter and search their home. Sergeant Troup testified that he took numerous photographs of the home and described the photographs entered into evidence. As Sergeant Troup walked through the house, he observed that various rooms in the house were filled with trash and filth, including bug cocoons, empty beverage cans, used paper plates, dirty clothes, and spoiled food. The floor of the house was not visible because of the trash, and the odor inside was so strong that Sergeant Troup threw up several times in the first five minutes of being inside the house. There were cockroaches and a large number of used diapers containing feces throughout the house. Sergeant Troup noted that he saw a spoiled diaper on top of baby formula.

Sergeant Troup testified that when he entered the kitchen, cockroaches scurried over the overflowing trash. Dead cockroaches, mouse droppings, and spilled and spoiled food were in the refrigerator and throughout the kitchen. Cockroaches were also found in the bathroom, along with dirty rags. Sergeant Troup saw that the bathtub and toilet were covered in mold and mildew. Sergeant Troup also noted that he had to crawl over trash to get to the bedrooms. He observed that the baby beds did not have linens and the lights were not working in the children's bedrooms. He also observed mice in the children's bedrooms. The dresser and walls were covered with crayon drawings. There were nails and screws on the floor and milk jugs containing spoiled and molded milk were on the shelves.

Sergeant Donald Bandy testified that he went with Sergeant Troup to search the defendants' home. He testified similarly to Sergeant Troup regarding the conditions of the defendants' home. Sergeant Bandy noted that he videotaped the investigation of the home while Sergeant Troup took pictures. Sergeant Bandy noted that the odor and sight inside of the house was foul and overwhelming for him. The videotape of the investigation of the defendants' house was entered into evidence and shown to the jury without audio. Several individuals testified as the custodians of records from the defendants' places of employment. They testified that Mr. Brewington was employed with the Sheriff's Office as a correction officer and had health insurance for his family while Mrs. Brewington was employed at Walmart.

Dolota Pittman testified that she was a former foster care case manager with DCS. She recalled that she originally had the defendants' children removed from the defendants' home and placed them with the children's paternal grandparents. However, later the children were placed in foster care. Mrs. Pittman recalled that Katarina and Bryson were taken to get eye exams and Bryson needed glasses. Mrs. Pittman stated that a permanency plan meeting was held with the defendants present at the meeting. Mrs. Pittman said that adoption was discussed as part of the plan and that the defendants did not appear "overly concerned" with someone adopting their children. However, Mr. Brewington indicated that he was very concerned about losing his job. According to Mrs. Pittman, she was in "shock" when she first saw Madison. Madison did not have any teeth although she was eleven months old and she was wearing newborn diapers and clothes sizes zero to three months. Mrs. Pittman said that she saw a marked difference in Ashley and Madison's health after a month of being in foster care. They both gained weight and appeared happier and friendlier. On cross-examination, Mrs. Pittman acknowledged that she was not aware of any particular health problems the children had when they came into DCS custody. She also acknowledged that the children came into DCS custody [i]n January but the physical examinations were not performed on the children until January 25.

Foster parent Tammy Linerode testified that she cared for the defendants' four children for almost five months following their removal from the defendants' home. According to Mrs. Linerode, Katarina, who was in kindergarten, was "way behind" in class and had a decayed front tooth. Bryson had not received all of his shots. Bryson was delayed and was placed in a special prekindergarten program. Bryson's speech was poor, and he was not potty trained. Ashley could barely walk even though she was two years old. She was very "stiff-legged" and preferred to be carried. Ashley had little hair and was thin and "strawy." She was not potty trained. She needed glasses and had to be placed in a speech therapy program because she could not speak. Madison weighed thirteen pounds and had turned one year old when she arrived at the Linerode home. She could barely lift her head or pick up food. Madison had very little hair and she had not received her immunization shots. Mrs. Linerode testified that while the children stayed in her home they made progress. Katarina learned to read and write her name. Bryson "thrived" at school. Ashley started to walk around much more and talked continually. Madison was able to sit and pull herself up. She also gained weight.

Linda Boyers, Executive Director of the Gallatin Day Care Centers, testified that she had to feed Madison with a bottle in contrast to other one year

olds who could drink out of "sippy" cups or straws. Madison was very tiny and weak. She could not use her arms and legs. Madison needed extensive care. Mrs. Boyers testified similarly to Mrs. Pittman and Mrs. Linerode regarding Madison's weight, hair, and size. Mrs. Boyers noted that Madison was placed in physical therapy and did not make noises or speak for some time. Eventually she progressed into solid foods, gained weight, and became a "miracle baby." Mrs. Boyers testified that when Ashley arrived at the center her teeth were terrible and she had brittle hair. She wore sizes nine to twelve months even though she was two years old and she walked like a one year old. She did not talk and had poor eyesight. According to Mrs. Boyers, Ashley had a "haunted look in her eye" and her stomach could not accept normal food at first. She was initially fearful of having her diaper changed. Josie Davis, another center director, testified similarly as to the children's initial condition at the day care center and the progress made with each child.

Misty Ann Donoho testified that she was Katarina's kindergarten teacher for the school year 2005-06. She recalled that at the beginning of the school year, Katarina was sent home because she had a severe case of lice. Katarina also lacked social and communication skills, was pale, appeared to be tired all the time, and was often dressed in dirty clothes. Mrs. Donoho noted that Katarina was allowed a free breakfast and a discounted lunch at school. Mrs. Donoho said she thought it odd that Mrs. Brewington would stay with Katarina in the morning and share Katarina's breakfast offered by the school. Mrs. Donoho said that she saw a marked difference in Katarina's accomplishments and behavior in school after Katarina was placed in foster care.

Sherri England testified that she worked at the Sumner County Health Department. She recalled that she consulted with the defendants regarding the diets of their children. At the time, the defendants were informed that their children's diets were inadequate as to their nutritional intake.

Dr. David Goldberg testified that he was the emergency room physician when Ashley and Madison were first examined on January 4, 2006. According to Dr. Goldberg, two-year-old Ashley was excessively thin, weak, and developmentally delayed. Ashley's weight had not progressed as it would in a normal two year old. At birth, Ashley weighed eight pounds and five ounces and upon examination she weighed nineteen pounds and five ounces. Ashley had not received all of the typical vaccinations for a two year old. Although Mrs. Brewington maintained that Ashley was fine and not having any problems, Dr. Goldberg's examination revealed that Ashley was not alert and

active, and she was not able to walk like a normal two year old. Dr. Goldberg noted that Ashley could sit up and feed herself. Dr. Goldberg diagnosed Ashley with "marasmus," which is a form of starvation where the "proteins in the muscles are burned for energy" because the person is not getting enough food to eat. Dr. Goldberg said that marasmus can lead to death. When asked, Dr. Goldberg agreed that if Ashley had not been fed there was a substantial risk of death.

Dr. Goldberg testified that Madison was missing hair which was uncommon for a normal eleven month old girl. Madison had severe muscle wasting in her legs, thinner than normal arms and legs, protruding ribs, and was underweight. At birth, Madison weighed eight pounds and upon examination she weighed ten pounds and six ounces. Dr. Goldberg found her to be well below normal range of height and weight for children her age. Dr. Goldberg diagnosed Madison with "marasmus" and moderately severe diaper rash. According to Dr. Goldberg, Madison was suffering more severely from marasmus than Ashley and if left untreated her condition would have led to death. Madison could not sit up and was not alert. Dr. Goldberg opined that he expected Madison to have suffered some decrease in her eventual brain function as a result of starvation. On cross-examination, Dr. Goldberg acknowledged that his examination did not find any other serious medical conditions.

Dr. Victoria Rundus, a pediatrician treating Ashley and Madison, testified that she first saw Ashley and Madison in February of 2006. Based on her review of the medical records, Dr. Rundus expressed the same medical concerns as Dr. Goldberg. According to Dr. Rundus, Ashley and Madison's health issues and delayed development stemmed from not being properly fed. Dr. Rundus said that Ashley and Madison would have died if they continued on the same course of not being fed.

Id. at *1-5. On the basis of this proof, the jury found both the Petitioner and Mrs. Brewington guilty of two counts of child neglect as to Bryson and Katarina, Class E felonies, and two counts of aggravated child neglect as to Ashley and Madison, Class A felonies. Id. at *5. The trial court subsequently sentenced the Petitioner and Mrs. Brewington each to an aggregate sentence of twenty-five years. Id.

In his post-conviction claim for relief, the Petitioner alleged that his lawyer ("Trial Counsel"), who represented him both in the criminal case and in the juvenile court proceedings that preceded the criminal trial, was ineffective in numerous respects and that the Petitioner was thereby prejudiced. Before this Court, the Petitioner focuses on his claims

that Trial Counsel was ineffective in failing to file a motion to sever his trial from that of his wife; failing to seek a competency evaluation of the Petitioner; failing to adduce rebuttal medical testimony; failing to communicate adequately with the Petitioner; and failing to prepare adequately for the sentencing hearing.

At the post-conviction hearing, Trial Counsel testified that he had significant experience in cases involving child welfare issues. He had represented "[a]t least 3,000" defendants in criminal matters and had participated in "[t]housands" of trials.

Trial Counsel was appointed to represent the Petitioner. Trial Counsel also represented the Petitioner in the termination of parental rights proceedings in juvenile court. As such, he attended the depositions and thereby obtained the benefit of additional discovery that was not available in the criminal case. As to the strength of the State's case, Trial Counsel testified, "I have never seen stronger evidence in a criminal case that I've been involved with." Nevertheless, when Trial Counsel showed the Petitioner the photographs of the children, the Petitioner "didn't really have all that much of a reaction." Trial Counsel added, "at no point did he seem to grasp the gravity of this case." Nor did the Petitioner seem concerned about what had happened. Indeed, Trial Counsel explained that, during a period of several months prior to trial, Trial Counsel did not know where his client was. Although he tried to telephone the Petitioner, the number he had been provided was "disconnected." The Petitioner did not contact him. Trial Counsel nevertheless continued to prepare for trial. As the trial date approached, he traveled to the Petitioner's home to seek him out. Trial Counsel added that he met with the Petitioner independently on several occasions and jointly with his codefendant and her counsel on several occasions.

Although Trial Counsel asked the Petitioner to provide him with the names of witnesses who would be helpful, the Petitioner never did so. Trial Counsel spoke with the Petitioner's mother, the grandmother of the subject children, and determined that she did not want to testify. Moreover, Trial Counsel determined that, based on their conversation, she would not be a beneficial witness. Trial Counsel spoke to one other relative, whom he did not remember. He also spoke with the guardian ad litem who had been appointed to the children. He testified, "Based upon my having done the Juvenile Court case, I did not think there were any witnesses that I could present that would aid in the defense of [the Petitioner] in this case."

Trial Counsel filed a motion in limine regarding the videotape that law enforcement made of the Petitioner's home. Although the trial court ruled that the video would be admitted, Trial Counsel was successful in having redacted the audio portion of the video (which included the sounds of Sergeant Troup vomiting). Trial Counsel also filed a motion in limine to exclude photographs of the children, but the trial court denied the motion.

As to trial strategy, Trial Counsel testified, "the only thing that I believed that could effectively be done in front of the jury was to minimize the damage with regard to the State's overwhelming proof." He added:

> Of all the jury trials I've done, this is probably the one for which I have the least second-guessing because it was my considered belief that after watching the jury's reaction to the photographs that were shown on the first day of trial, that nothing I said after that point was going to make any difference at all to the jury.

The State made several plea offers, which Trial Counsel conveyed to the Petitioner. One offer was for seventeen years, which Trial Counsel "strongly encouraged" the Petitioner to consider. The Petitioner rejected the offer. Trial Counsel added, "I don't think I've ever spoken more forcefully with a client than I did with [the Petitioner] on the importance of him seriously considering the State's offer." He clarified that he "conveyed to [the Petitioner] in the strongest possible terms every offer that the State made and strongly encouraged him to consider those offers."

Trial Counsel acknowledged that he did not adduce any medical proof at trial in rebuttal to the testimony of Doctors Goldberg and Rundus. He explained: "I did not believe that based upon the depositions of the doctors, their testimony in Juvenile Court, my review of the medical records, that I could find an expert that would refute their testimony." He added, "I talked to a number of doctors, and I didn't feel that I could find anyone who would refute that based upon their view of Dr. Rundus' credentials." He also stated, "I have never seen stronger expert testimony than those doctors provided. And, again, I've done these cases before; I did not feel that I could find an expert at any price who could refute what they were saying."

As to sentencing, Trial Counsel testified that he discussed the issues with the Petitioner and told him what he would be doing at the hearing. As to his preparation, he stated: "I reviewed the aggravating and mitigating factors. I went over those with him, as I recall. I had, again, spoken with his mother. Tried to obtain something that I felt was mitigating evidence that I could present and was able to come up with no mitigating evidence at all."

On cross-examination, Trial Counsel stated that he met with the Petitioner several times during the juvenile court proceedings. He also acknowledged that the Petitioner's seeming lack of understanding of the gravity of his situation was "very unusual." He was "concerned" about the Petitioner's mental health status, but explained that "after [he] received the report that was done by Dr. Pestrak out of the Juvenile Court Proceeding, [he]

didn't feel that there was anything in that report that would warrant a forensic evaluation to be requested of [the trial court]." He later clarified that Dr. Pestrak had performed a psychological evaluation of the Petitioner as part of the juvenile court proceedings to terminate parental rights.

Trial Counsel acknowledged that he did not go through all of the State's evidence with the Petitioner, explaining that the Petitioner had already seen or heard it during the juvenile court proceedings. He stated that he met the Petitioner once or twice at his office and also in court during the juvenile court proceedings. Trial Counsel also met with the Petitioner at the Petitioner's house on the Friday before trial. He added, "I never heard a single solitary thing from [the Petitioner]. I had to track him down."

He testified that he spoke with the law enforcement officers that were involved in the case. He reviewed the medical records of the children that were generated after they were taken from the home to the hospital emergency room. Dr. Rundus testified in juvenile court that the youngest child "would have died absent intervention." Trial Counsel stated that Dr. Rundus rendered this medical opinion "to a 100 percent of medical certainty." Trial Counsel spoke with the Petitioner during the juvenile court proceedings "about how compelling that testimony was after he heard it in Juvenile Court."

Trial Counsel stated that a severance of the codefendants would have benefitted the Petitioner but that he did not think there was a legal basis for the trial court to grant a severance. He also stated that the Petitioner wanted to testify at trial and that they discussed whether he should:

> I told him that I thought the crucial question that the jury was going to want to have the answer to was, how on earth could you let it get to the point that we saw in the pictures? And that if he couldn't reasonably give an answer to that question that in my opinion nothing he said was going to make any difference. He indicated to me he did not feel he could answer that question, and based upon that, indicated that he declined to testify.

Trial Counsel acknowledged that he had been shown photographs of the children that showed them happy and smiling. Asked why he did not use those photographs on the Petitioner's behalf, he responded,

> I very carefully watched because I was aware of what the [State's] photos were going to show. I very carefully watched the jury as each and every photo was shown. It was – I have done murder cases where I saw less horror on jurors['] faces than I saw with regard to those photos. And the

conditions that those photos showed, were not conditions that happened in a day or two. Those were conditions that had to accumulate over months of neglect. I didn't believe that showing happy, smiling children in the past was going to in any way diminish the impact of the State's proof. In fact, it was my opinion, that it might make it worse.

And as to why he did not try to admit photographs of the house after it had been cleaned up, Trial Counsel testified, "[i]n my opinion, that would not benefit [the Petitioner], but would hurt him because that would show that they could have cleaned it up prior to the removal of the children and simply didn't."

Trial Counsel acknowledged that he did not discuss the pre-sentence report with the Petitioner or what the Petitioner should or should not say in conjunction with its preparation. He did meet with the Petitioner after it was prepared and went over it with him prior to the sentencing hearing. Trial Counsel tried to get family members to come to the sentencing hearing and speak on the Petitioner's behalf but "none were willing to do so." The Petitioner testified at the sentencing hearing.

The Petitioner testified at the post-conviction hearing that Trial Counsel was appointed to him on the day he was arraigned. He met with Trial Counsel that day. He had previously met with Trial Counsel several months earlier in conjunction with the juvenile court proceedings. The Petitioner stated that he lived at the same residence during the entire time period at issue. Although his home phone "was active during that time frame off and on," he and his wife eventually "just settled with the cell phones." The Petitioner testified that he "recalled" giving Trial Counsel his cell phone number but could not "say for sure."

He met with Trial Counsel at Trial Counsel's office at some point between March and July of 2006. According to the Petitioner, Trial Counsel "was trying to get [him] to take a deal" but the Petitioner "was turning it down." They reviewed some of the photographs that had been taken at the Petitioner's house, but the Petitioner did not recall reviewing a video. He met with Trial Counsel at the courthouse on the next settlement date in September 2006. He turned down another plea bargain offer. Another settlement date was set in November. In November, the matter was set for trial on May 1 through 3, 2007. The next time the Petitioner saw Trial Counsel was April 30, 2007, at the Petitioner's house. There were no communications during the interim.

Asked why he had no communications with Trial Counsel during the interim, the Petitioner responded,

I was pretty much arrogant (sic). I trusted the system. I trusted in a lawyer. I didn't know what I needed to do. What questions I should ask or

any of that. So I believed I had a lawyer that was doing the job, and I trusted at that.

The Petitioner also testified that Trial Counsel never discussed with him any defenses that would be presented at trial and did not rehearse his examinations with him in the event he chose to take the stand. He did not recall discussions about developing expert medical testimony, about severing his trial from that of his wife, or about suppressing the statement he made to law enforcement.[1] The last offer he received was sixteen years. This offer was made on the second day of trial, and he rejected it.

After he was convicted, the only time the Petitioner saw Trial Counsel was "for a few minutes" on the night before the sentencing hearing. By that time, the presentence report had been completed.

The Petitioner acknowledged that he had not given Trial Counsel a list of potential witnesses to testify on his behalf.

After considering this proof, the post-conviction court ruled from the bench. The court specifically accredited Trial Counsel's credibility over that of the Petitioner. The post-conviction judge, who had also presided over the trial, determined that Trial Counsel had not been deficient in any respect. Rather, "[i]t was [the Petitioner's] attitude . . . that created problems in this case." The judge continued: "I find that [Trial Counsel] did an incredible job of dealing with what he had to do here. . . . It was not an ordinary case because [of] the subject matter but secondly it was not an ordinary case because [of] the overwhelming evidence that he had to deal with." The post-conviction court concluded, "there's no need to look at prejudice because I find no deficiency" and denied the Petitioner's claim for relief.

**Analysis**

*Standard of Review*

Relief pursuant to a post-conviction proceeding is available only where the petitioner demonstrates that his or her "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2006). To prevail on a post-conviction claim of a constitutional violation, the petitioner must prove his or her allegations of fact by

---

[1] Trial Counsel testified that the videotape of the Petitioner's statement was not played at trial.

"clear and convincing evidence." Tenn. Code Ann. § 40-30-110(f) (2006). See Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999). This Court will not overturn a post-conviction court's findings of fact unless the preponderance of the evidence is otherwise. Pylant v. State, 263 S.W.3d 854, 867 (Tenn. 2008); Sexton v. State, 151 S.W.3d 525, 531 (Tenn. Crim. App. 2004). We will defer to the post-conviction court's findings with respect to the witnesses' credibility, the weight and value of their testimony, and the resolution of factual issues presented by the evidence. Momon, 18 S.W.3d at 156. With respect to issues raising mixed questions of law and fact, however, including claims of ineffective assistance of counsel, our review is de novo with no presumption of correctness. See Pylant, 263 S.W.3d at 867-68; Sexton, 151 S.W.3d at 531.

*Ineffective Assistance of Counsel*

The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a criminal defendant the right to representation by counsel at trial.[2] Both the United States Supreme Court and the Tennessee Supreme Court have recognized that this right is to "reasonably effective" assistance, which is assistance that falls "within the range of competence demanded of attorneys in criminal cases." Strickland v. Washington, 466 U.S. 668, 687 (1984); see also Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). The deprivation of effective assistance of counsel at trial presents a claim cognizable under Tennessee's Post-Conviction Procedure Act. See Tenn. Code Ann. § 40-30-103; Pylant, 263 S.W.3d at 868.

In order to prevail on a claim of ineffective assistance of counsel, the petitioner must establish two prongs: (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. See Strickland, 466 U.S. at 687; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The petitioner's failure to establish either prong is fatal to his or her claim of ineffective assistance of counsel. Goad, 938 S.W.2d at 370. Accordingly, if we determine that either prong is not satisfied, we need not consider the other prong. Id.

To establish the first prong of deficient performance, the petitioner must demonstrate that his lawyer's "acts or omissions were so serious as to fall below an objective standard of 'reasonableness under prevailing professional norms.'" Vaughn v. State, 202 S.W.3d 106, 116 (Tenn. 2006) (quoting Strickland, 466 U.S. at 688)). Our Supreme Court has explained that:

---

[2] The Sixth Amendment right to counsel is applicable to the States through the Fourteenth Amendment to the United States Constitution. See Gideon v. Wainwright, 372 U.S. 335, 342 (1963); State v. Howell, 868 S.W.2d 238, 251 (Tenn. 1993).

[T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence. Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.

Baxter, 523 S.W.2d at 934-35 (quoting Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974)). When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." Howell v. State, 185 S.W.3d 319, 326 (Tenn. 2006) (citing Strickland, 466 U.S. at 689). Additionally, a reviewing court "must be highly deferential and 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" State v. Honeycutt, 54 S.W.3d 762, 767 (Tenn. 2001) (quoting Strickland, 466 U.S. at 689). We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. Rhoden v. State, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991). We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)).

As to the prejudice prong, the petitioner must establish a "reasonable probability that but for counsel's errors the result of the proceeding would have been different." Vaughn, 202 S.W.3d at 116 (citing Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. "That is, the petitioner must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." Pylant, 263 S.W.3d at 869 (citing State v. Burns, 6 S.W.3d 453, 463 (Tenn. 1999)). "A reasonable probability of being found guilty of a lesser charge . . . satisfies the second prong of Strickland." Id.

Turning to the instant case, it is clear that the evidence does not preponderate against the post-conviction court's findings. Similarly, the Petitioner has failed to demonstrate by clear and convincing evidence that Trial Counsel's performance was either deficient or that the Petitioner suffered any prejudice from Trial Counsel's assistance. With reference to the Petitioner's specific claims in this appeal, the proof demonstrated that Trial Counsel made a tactical decision about whether to file a motion to sever the Petitioner's trial from that of his codefendant wife. In rejecting a similar contention, a panel of this Court emphasized that

"[t]his court has repeatedly held that we cannot second-guess a tactical and strategic choice made by trial counsel unless those choices were uninformed because of inadequate preparation." Kenneth J. Jones v. State, No. M2007-00397-CCA-R3-PC, 2008 WL 271909, at *7 (Tenn. Crim. App. Feb. 1, 2008) (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982); Alley v. State, 958 S.W.2d 138, 149 (Tenn. Crim. App. 1997)). The record in this case demonstrates that Trial Counsel engaged in adequate preparation and made an informed decision not to seek a severance.

As to the Petitioner's contention that Trial Counsel should have requested a competency evaluation, there is simply no proof demonstrating that a forensic evaluation was either necessary or would have benefitted the Petitioner. Likewise, as to the Petitioner's contention that Trial Counsel should have presented rebuttal medical proof, there is no proof in the record demonstrating that such proof was available. We emphasize that, when a petitioner alleges that his or her lawyer was ineffective by failing to adduce certain proof at trial, it is incumbent upon the petitioner to adduce that proof at the post-conviction hearing. We reiterate:

> When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing. As a general rule, this is the only way the petitioner can establish that (a) a material witness existed and the witness could have been discovered but for counsel's neglect in his investigation of the case, (b) a known witness was not interviewed, (c) the failure to discover or interview a witness inured to his prejudice, or (d) the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner. It is elementary that neither a trial judge nor an appellate court can speculate or guess on the question of whether further investigation would have revealed a material witness or what a witness's testimony might have been if introduced by defense counsel. The same is true regarding the failure to call a known witness. In short, if a petitioner is able to establish that defense counsel was deficient in the investigation of the facts or calling a known witness, the petitioner is not entitled to relief from his conviction on this ground unless he can produce a material witness who (a) could have been found by a reasonable investigation and (b) would have testified favorably in support of his defense if called. Otherwise, the petitioner fails to establish the prejudice requirement mandated by Strickland v. Washington.

Black v. State, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990) (footnote omitted). See also Pylant v. State, 263 S.W.3d 854, 869 (Tenn. 2008) ("To succeed on a claim of

ineffective assistance of counsel for failure to call a witness at trial, a post-conviction petitioner should present that witness at the post-conviction hearing.").

In the instant case, although the Petitioner alleged that Trial Counsel was ineffective in failing to present witnesses on his behalf at trial and/or sentencing, and particularly failed to rebut the expert medical proof with expert defense proof, the Petitioner called no such witnesses at the post-conviction hearing. Accordingly, he cannot prevail on these claims of ineffective assistance of counsel.

As to the Petitioner's claim that Trial Counsel failed to communicate with him adequately, the proof established that the Petitioner was avoiding Trial Counsel and not that Trial Counsel was failing to prepare for trial. The proof is also wholly inadequate to establish that Trial Counsel failed to perform adequately with respect to sentencing.

In short, the Petitioner has failed to substantiate any of his claims with credible proof. Accordingly, we hold that the Petitioner is not entitled to post-conviction relief.

## Conclusion

For the foregoing reasons, the Petitioner has failed to establish that he is entitled to post-conviction relief. Therefore, we affirm the judgment of the post-conviction court denying relief.

_____
JEFFREY S. BIVINS, JUDGE